667 So.2d 36 (1995)
Linda B. PARR
v.
CHAMPION INTERNATIONAL CORPORATION and Brown & Root U.S.A., Inc.
1931040.
Supreme Court of Alabama.
May 26, 1995.
Rehearing Denied July 28, 1995.
*37 David Leon Ashford and Bruce J. McKee, Birmingham, for Appellant.
James R. Shaw and Robert V. Rodgers, Birmingham, for Appellees.
RICHARD L. JONES, Retired Justice.
Linda B. Parr appeals from a final summary judgment entered in favor of Champion International Corporation and Brown & Root, U.S.A., Inc., in Mrs. Parr's wrongful death action against multiple defendants. We reverse and remand.
Champion International Corporation operates a paper mill in Courtland, Alabama, on land owned by the Industrial Development Board of the City of Courtland ("IDB"). In 1988, Champion, as the owner, and Brown & Root, U.S.A., Inc. ("B & R"), as general contractor, executed a contract for the construction of major improvements to Champion's paper mill in Courtland ("the Paper Mill Project").
In 1989, IDB, as owner, and B & R, as general contractor, executed a contract for construction of a chemical recovery boiler facility at Champion's Courtland paper mill, which included the construction of an evaporator island facility ("the Evaporator Island Project"). This contract provided, in part, 1) that IDB had leased to Champion land in Courtland and the pulp and paper mill on the land; and 2) that IDB wanted to construct additional manufacturing facilities and to install additional equipment at the mill "for leasing to Champion."
In furtherance of its contract with IDB, B & R executed a subcontract with Babcock & Wilcox Company ("B & W"), as the subcontractor. The subcontract provided that B & W would provide "at its expense all design engineering, construction management, labor, consumable materials, supplies, tools, licenses required by law ..., and necessary services" for the Evaporator Island Project. In turn, B & W executed a "turnkey" subcontract with HPD, Inc., under which HPD was responsible for constructing the Evaporator Island Project (except for the concrete pad, which was constructed by Sunland Construction Company). HPD subcontracted the steel erection work of the Evaporator Island Project to CBI Na-Con, Inc.
The plaintiff's decedent, Thomas Joseph Parr, was an employee of CBI Na-Con. On May 7, 1990, Parr was working approximately 20-30 feet from the ground on a steel tower at the Evaporator Island Project. Although he was wearing a safety device that consisted of a safety belt and "lanyard," Parr had not "tied off" or used his safety equipment to attach himself to the steel framea required safety measure for men working in Parr's position. Parr was hit by the steel beam he was helping to attach, and he fell from the tower. Parr died the next day as a result of his injuries.
*38 Linda B. Parr, as the dependent widow of Thomas Joseph Parr, pursuant to Alabama's Workers' Compensation Act (Ala.Code 1975, § 25-5-11) brought this wrongful death action against Champion, B & R, B & W, and Sunland Construction Company, Inc., alleging, among other things, that the defendants had negligently breached their duty to provide Thomas Joseph Parr with a reasonably safe workplace and that negligence had caused Thomas Joseph Parr to be killed. The trial court granted summary judgment motions in favor of defendants Champion and B & R and made the summary judgment final pursuant to Rule 54(b), Ala.R.Civ.P. Linda Parr appeals.
Thomas Joseph Parr was not an employee of Champion or B & R; thus, any duty to provide Parr with a safe workplace arose only if Champion and B & R "retain[ed] or reserv[ed] the right to control the manner in which the independent contractor [here, Parr as an employee of CBI Na-Con] performs its work." Mead Coated Board, Inc. v. Dempsey, 644 So.2d 872 (Ala.1994). Linda Parr contends that the record reflects sufficient evidence to create a triable issue of fact as to Champion's and B & R's retention of control over (including the right to inspect) the manner and method of Parr's workas an employee of subcontractor CBI Na-Con at the Evaporator Island Project. Thus, argues Linda Parr, the trial court erred in entering the summary judgment for Champion and B & R.
On appeal, Linda Parr must prove that there was before the trial court substantial evidence in support of her claim to defeat Champion and B & R's motions for summary judgment. Thus, she must show that she presented to the trial court "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment [could have] reasonably infer[red] the existence of the fact sought to be proved" (West v. Founders Life Assur. Co. of Florida, 547 So.2d 870, 871 (Ala.1989)): that Champion and B & R retained such control over the manner and method of Thomas Parr's work as to place them under a duty to provide him a safe workplace.
Whether a party has retained sufficient control over the manner and method of the work of another to support a finding of a master/servant relationship between the partieswhich gives rise to the duty to provide a safe workplacehas been addressed by this Court in numerous decisions. In Mead, supra, the injured party was a log-truck driver and an employee of an independent contractor that supplied logs to Mead Coated Board, Inc., at Mead's paper mill. The evidence showed that Mead's rules and regulations controlled the manner in which the independent contractors unloaded the logs on the Mead premises, including giving Mead employees the authority to refuse to admit or unload any truck that did not comply fully with Mead's requirements. Quoting from Weeks v. Alabama Electric Cooperative, Inc., 419 So.2d 1381 (Ala.1982), and Thompson v. City of Bayou La Batre, 399 So.2d 292 (Ala. 1981), the Mead Court held that when the premises owner reserves the right of control apparent in Mead, the relationship of owner-independent contractor changes to that of master-servant.
This same standard was approved in Lankford v. Gulf Lumber Co., 597 So.2d 1340 (Ala.1992), with, however, an analysis of a distinction that must be recognized in circumstances such as these.
"The test used in cases such as this to determine if a defendant may be held liable under respondeat superior ... is whether the alleged employer has reserved the right of control over the means by which the work is done; the test is not the actual exercise of such control. In other words, the defendant must have reserved the right to direct not only what shall be done, but also how it shall be done.
"`[T]he mere retention of the right to supervise or inspect the work of an independent contractor as the work progresses to ensure compliance with the terms of an agreement does not operate to create a master-servant relationship. There must be a retention of control over the manner in which the work is done, before an agency relationship is created.'

*39 "Pugh v. Butler Telephone Co., [512 So.2d 1317, 1318 (Ala.1987) ]."
Lankford, 597 So.2d at 1343. (Citations omitted.)
This Court has also written:
"A master-servant relationship is not created, however, when the owner merely retains the right to supervise or inspect work of an independent contractor as it progresses for the purpose of determining whether it is completed according to plans and specifications, and retains the right to stop work that is not properly done. Pate v. United States Steel Corp., [393 So.2d 992 (Ala.1981),] at 995."
Weeks, supra, 419 So.2d at 1383. See, also, Thomas v. Pepper Southern Constr., Inc., 585 So.2d 882 (Ala.1991).
To answer the ultimate factual question with respect to "control," it is necessary to review those portions of the deposition testimony relied on by the parties to support their respective contentions. Linda Parr argues that Kenneth Hill, safety supervisor for B & R, plainly testified that Champion required all its subcontractors to abide by Champion safety regulations and testified that Champion controlled the manner and method of Thomas Parr's work:
"Q. So with regard to the way Parr did his work that day and with regard to the kind of equipment used to hoist that steel beam, if either of those violate Champion safety rules, [the Champion safety inspector] had the ability to stop the job, didn't he?
"A. Yes, I would say he did.
"Q. To that extent, he certainly controlled the method and manner of the work, didn't he?
"A. Yes, sir."
Champion and B & R, however, point out that Hill went on to testify:
"Q. Other than [the Champion safety inspector] perhaps having the right to stop somebody if he saw something unsafe, he didn't control anything else regarding the construction, did he?
"A. Actually what [the Champion safety inspector] was, he was actually a go-between, between our construction people and the existing people. And if he saw anything, he could inform us, which anybody does, you know, not just necessarily [the Champion safety inspector], but if anybody in Champion sees a violation or sees anything, they report it.
"....
"Q. But you weren't looking to him to control the manner and method in which work was done?
"A. No, sir, I didn't look to [the Champion safety inspector] to do any of my work for me, no, sir, none whatsoever."
Hill also testified that Thomas Parr's work came under "a separate contract" for which Hill did not conduct safety inspections.
John Mauro, the CBI Na-Con project superintendent for the Evaporator Island Project, testified that representatives of both Champion and B & R made random "walk-throughs" of the project.
"Q. Did you know the specific purpose of any of those walk-throughs at any given time?
"A. To observe what was happening on the site, to make sure things conformed with what they had in mind.
"Q. Did that include safety?
"A. Yes.
"Q. Did that include the plans and specifications for that particular part of the Courtland project?
"A. Yes.
"Q. Are you aware of any occasions where Champion International employees or Brown & Root employees made recommendations to your company or your employees regarding safety?
"A. Yes."
Mauro stated, with regard to B & R safety inspector Kenneth Hill, "I'm sure he came through my site. What he was doing, I don't know." Mauro also testified that Champion required CBI Na-Con to abide by Champion's safety rules, that he was given a copy of *40 the Champion safety rules, and that he understood "safety was under the safety department of Champion." Mauro then stated that he understood that, as the CBI Na-Con project superintendent for the Evaporator Island Project, he was responsible for making sure that CBI Na-Con employees complied with Champion's safety requirements.
Linda Parr points out that Mauro gave the following answer in his testimony:
"Q. [T]he manner and method of hanging structural steel was one of the things that [Champion and B & R] could have looked at in any of these walk-throughs?
"A. Yes."
However, this particular answer was obtained after Mauro had already testified as follows:
"Q. Specifically relating to erection of structural steel and the method and manner by which that was done on this job site, do you recall any of the walk-throughs by any of the personnel from Champion, B & R, ... that in any respect involved how that work was done?
"A. No.
"Q. And ... do you recall any specific comments or recommendations or statements from any of those walk-throughs that related to the method or manner in which this work was being done?
"A. No."
Mauro admitted that it was his impression that Champion and B & R had reserved the right to inspect CBI Na-Con employees at any time for safety reasons, but that he did not know if these parties had the right to stop the work of CBI Na-Con employees if they found something they did not like. Further, Mauro said he did not specifically recall a Champion or B & R walk-through at the Evaporator Island Project site for the purpose of noting the manner in which the work was being done. Finally, Mauro testified that all CBI Na-Con employees received a booklet setting out CBI Na-Con safety regulations; that CBI Na-Con had its own safety inspectors who were responsible for maintaining safety on the Evaporator Island Project; and that CBI Na-Con did not look to other entities to instruct its own employees regarding safety.
In evaluating apparently conflicting testimony of a single witness, we look to the case law for guidance. This Court has consistently refused to allow a party to contradict prior testimony in an effort to defeat a motion for summary judgment.[1] In Tittle v. Alabama Power Co., 570 So.2d 601 (Ala. 1990), however, the Court clarified the rule, making it clear that the rule's prohibition applies only to a party and not to a nonparty witness. Where a nonparty witness gives contradictory testimony, a portion of which is favorable to the nonmovant in a summary judgment context, the trial court must leave to the jury's prerogative the resolution of the factual issue.[2]
Applying the Tittle rule to the foregoing summary of the testimony, we are constrained to hold that the trial court, in granting these defendants' motions for summary judgment, necessarily accepted that portion of the witness's testimony most favorable to the movant and thus usurped the exclusive province of the jury. The record, including the referenced testimony, when viewed in light of the strongest inferences favorable to the nonmovant, contains substantial evidence from which a reasonable person could infer that Champion and B & R had retained the requisite degree of control over CBI Na-Con's work to create a duty in Champion and B & R to provide CBI Na-Con employees with a safe workplace.
Therefore, we hold that the evidence before the trial court on the motions for summary judgment created a genuine issue of *41 material fact with respect to the degree of control, or right of control, if any, on which would rest the defendants' legal duty to provide Thomas Parr with a safe workplace as a result of a master/servant relationship. Because we hold that the trial court erroneously granted Champion and B & R's motions for summary judgment, the judgment appealed from is reversed and the cause is remanded.[3]
This opinion was prepared by retired Justice RICHARD L. JONES, sitting as a Justice of this Court pursuant to § 12-18-10(e), Ala.Code 1975, and it is hereby adopted as that of the Court.
REVERSED AND REMANDED.
SHORES, KENNEDY, INGRAM, COOK, and BUTTS, JJ., concur.
HOUSTON, J., concurs in part and dissents in part.
MADDOX, J., dissents.
HOUSTON, Justice, concurring in part and dissenting in part.
I concur in the reversal as to the first and second theories of liability, but dissent from the reversal as to the third theory.
NOTES
[1] See, for example, Doe v. Swift, 570 So.2d 1209 (Ala.1990); Couch v. Woody Anderson Ford, Inc., 558 So.2d 888 (Ala.1989); Robinson v. Hank Roberts, Inc., 514 So.2d 958 (Ala.1987); Lady Corinne Trawlers v. Zurich Ins. Co., 507 So.2d 915 (Ala.1987).
[2] For two subsequent cases applying the holding in Tittle, see McAlpin v. City of Decatur, 628 So.2d 611 (Ala.1993); and Yarbrough v. Sears, Roebuck & Co., 628 So.2d 478 (Ala.1993).
[3] It should be noted that this appeal raises, and this opinion addresses, only the limited factual issue of "control," as that factual issue relates to the legal issue of "duty" owned by Champion and B & R. No other issue yet to be tried on remand of the case (e.g., the elements of breach of duty and proximate causation, and the affirmative defense of contributory negligence) is before this Court for disposition at this time.